No. 25-5461

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

ANTHONY CAMARCA
*Plaintiff-Appellant*

v.

CITY OF COVINGTON, KY POLICE DEPARTMENT; *et al.*
*Defendants-Appellees*

On appeal from the United States District Court
for the Eastern District of Kentucky at Covington
Case No. 2:22-CV-00128-KKC-CJS

**BRIEF OF APPELLEES**

Respectfully submitted,

**/s/ Jeffrey C. Mando**
Jeffrey C. Mando, Esq. (#43548)
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY 41011
p: 859.394.6200 | f: 859.392.7200
jmando@adamsattorneys.com

*Attorney for Defendants-Appellees, the City of Covington Police Department; Officer Ross Woodward; Officer Robert Christen; Officer Bradley Morris; Officer Samuel Mathews; and, Sergeant Michael Gilliland*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1, Appellees, City of Covington, KY Police Department; Officer Ross Woodward; Officer Robert Christen; Officer Bradley Morris; Officer Samuel Mathews; and, Sergeant Michael Gilliland, make the following disclosures:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? **NO**

      If answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

2.    Is there a publicly owned corporation, not a party to the appeal, which has a financial interest in the outcome? **NO**

      If the answer is YES, list the identity of such corporation and the nature of the financial interest.


*/s/ Jeffrey C. Mando*                    **October 6, 2025**
Jeffrey C. Mando, Esq.                    Date

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ................................................................................................ i

TABLE OF AUTHORITIES ............................................................................. iv

STATEMENT REGARDING ORAL ARGUMENT ................................................ vi

ISSUES PRESENTED FOR REVIEW ................................................................ 1

STATEMENT OF THE CASE ........................................................................... 3

SUMMARY OF THE ARGUMENT ................................................................. 18

ARGUMENT ............................................................................................... 23

I.     THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON CAMARCA'S CLAIMS AGAINST OFFICERS WOODWARD AND CHRISTEN FOR FALSE ARREST AND UNLAWFUL DETENTION ................................................................. 23

     A.     CAMARCA IS COLLATERALLY ESTOPPED FROM BRINGING CLAIMS FOR FALSE ARREST OR UNLAWFUL DETENTION ................................................... 24

     B.     CAMARCA'S DETENTION AND ARREST WERE SUPPORTED BY PROBABLE CAUSE ...................................... 24

     C.     ALTERNATIVELY, THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY ................................................ 29

II.     THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON CAMARCA'S EXCESSIVE FORCE CLAIM AGAINST OFFICERS WOODWARD AND CHRISTEN ...................... 31

     A.     OFFICER WOODWARD DID NOT USE EXCESSIVE FORCE WHEN HE PUSHED CAMARCA TOWARDS THE WALL ................................................................. 33

     B.     OFFICERS WOODWARD AND CHRISTEN DID NOT USE EXCESSIVE FORCE WHEN TAKING CAMARCA TO THE GROUND TO PLACE HIM UNDER ARREST ............................ 36

C.     OFFICER WOODWARD DID NOT USE EXCESSIVE FORCE WHEN HE LOST HIS GRIP ON CAMARCA AS HE FELL ...................................................................................... 38

D.     OFFICERS WOODWARD AND CHRISTEN DID NOT USE EXCESSIVE FORCE WHEN THEY ESCORTED CAMARCA FROM THE HOTEL ...................................................................... 39

E.     ALTERNATIVELY, THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY .................................................................. 40

III.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON CAMARCA'S CLAIMS FOR FAILURE TO INTERVENE CLAIM AGAINST OFFICERS MORRIS, MATHEWS, AND GILLILAND .......................................................... 43

IV.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO ON CAMARCA'S EQUAL PROTECTION AND DUE PROCESS CLAIMS .................................................................. 45

V.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON PLAINTIFF'S *MONELL* CLAIMS ............................................................................................. 48

VI.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON PLAINTIFF'S STATE AND PUNITIVE DAMAGES CLAIMS .......................................................... 50

VII.  CONCLUSION ............................................................................... 52

CERTIFICATE OF COMPLIANCE ......................................................... 52

CERTIFICATE OF SERVICE .................................................................... 53

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ............................. A

# TABLE OF AUTHORITIES

## Cases

*Amerson v. Waterford Twp.,* 562 Fed. Appx. 484 ..................................................44, 49

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987) .......................................................... 41

*Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) ................................................................ 31

*Bambach v. Moegle,* 92 F.4th 615 (6th Cir. 2024) ....................................................30, 40

*Barnett v. Smithwick,* 835 Fed. Appx. 31 (6th Cir. 2020) ......................................... 31

*Buttino v. City of Hamtramck,* 87 Fed. Appx. 499 (6th Cir. 2004).......................... 24

Center for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365 (6th Cir. 2011)..................................................................................................................46

*Chaney-Snell v. Young,* 98 F.4th 699 (6th Cir. 2024) ................................................... 24

*City of Canton v. Harris,* 489 U.S. 378, 388, 109 S. Ct. 1197 (1989) ..................... 49

*City of Lexington v. Gray,* 499 S.W.2d 72 (Ky. 1973) ................................................ 51

*Club Italia Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby,* 470 F.3d 286 ............................................................................................................................. 47

*Criss v. City of Kent,* 867 F.2d 259 (6th Cir. 1988)...................................................... 24

*Crockett v. Cumberland College,* 316 F.3d 571 (6th Cir. 2003)................................. 25

*Cunningham v. Packard,* 2023 U.S. App. LEXIS 28377 (6TH Cir.) .............29, 34, 35

*Dalton v. Animas Corp.,* 913 F. Supp. 2d 370................................................................22, 50

*Davenport v. Causey,* 521 F.3d 544, 551 (6th Cir. 2008) .......................................... 32

*District of Columbia v. Wesby,* 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018)............................................................................................................................... 41

*District of Columbia v. Wesby,* 583 U.S. 48 (2018).................................................... 31

*Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006)...................................................................................................... 49

*Everage v. Whitaker,* 2006 U.S. Dist. LEXIS 13434 (E.D. Ky.).............................. 24

*Graham v. Connor,* 490 U.S. 386 (1989).......................................................................... 32

*Graham v. County of Washtenaw,* 358 F.3d 377 (6th Cir. 2004) ............................ 48

*Gray v. Lexington-Fayette Urban Co. Govt.,* 2013 U.S. Dist. LEXIS 91904 (E.D. Ky.)............................................................................................................ 24

*Grote v. Kenton County,* 85 F.4th 397 (6th Cir. 2023) ................................................ 48

*Kent v. Oakland County,* 810 F.3d 384 (6th Cir. 2016) .........................................31, 34

*King v. City of Rockford,* 97 F.4th 379, 393, 395, (6th Cir. 2024).........................................................................................19, 32, 33, 37, 43

*Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018)............................................................ 41

*Kowolenek v. Moore,* 2012 U.S. App. LEXIS 3843 (6th Cir.) .............................43, 44

*Marvin v. City of Taylor,* 509 F.3d 234 (6th Cir. 2007).........................................29, 34

*Mayo v. Macomb Cnty.,* 183 F.3d 554, 558 (6th Cir. 1999) ...................................... 49

iv

*Miller v. Sanilac City.,* 606 F.3d 240, 252 (6th Cir. 2010) .................................. 32, 37

*Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017) ...................................... 32

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) ............................... 48

*Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) ......................... 25

*Ontha v. Rutherford County,* 222 Fed. Appx. 498 ...................................... 44

*Palmer v. Com.,* 252 S.W.2d 677 (Ky. 1952) ...................................... 51

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................... 30, 40

*Radvansky,* 395 F.3d at 312 .................................................... 47

*Rigazio v. Archidiocese of Louisville,* 853 S.W.2d 295 (Ky. App. 1993) ...................................................................................... 23, 51

*Roberts v. Cruz,* 2023 U.S. App. LEXIS 4538, (6th Cir.) ............................ 41

*Rodriguez v. Passinault,* 637 F.3d 675, 687 (6th Cir. 2011) .................................. 39

*Rudlaff v. Gillispie,* 791 F.3d 638, 639, 641 - 44 (6th Cir. 2015) ..............20, 37, 41

*Scott v. Harris,* 550 U.S. 372, 381 (2007) ....................................... 38

*Shumate v. City of Adrian,* 44 F.4th 427 (6th Cir. 2022) .............................. 34

*Simmons v. Napier,* 626 Fed. Appx. 129 .............................................. 43

*Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby,* 470 F.3d 286 ...................... 47

*Spencer v. County of Huron*, 717 Fed. Appx. 555 (6th Cir. 2017) ......................... 24

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997) .............................. 24

*Thomas v. City of Eastpointe,* 715 Fed. Appx. 458 (6th Cir. 2017) ........................ 34

*Toon v. City of Hopkinsville,* 2011 U.S. Dist. LEXIS 40830 ................................ 22, 51

*VanPelt v. City of Detroit,* 70 F.4th 338, 341 (6th Cir. 2023) .................................. 39

*Wysong v. City of Heath,* 260 F. App'x 848, 854 (6th Cir. 2008) .......................... 42

**Statutes**

KRS 222.202(1) ............................................................................. 28

KRS 519.020 ................................................................................. 25

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees do not request oral argument. The issues on appeal are straightforward and have been fully developed in the briefs. As a result, Defendant-Appellees do not believe oral argument would aid the Court in its disposition of the appeal.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court properly granted summary judgment to Officers Woodward and Christen on Camarca's false arrest and unlawful detention claims based on issue preclusion when Camarca pled guilty to alcohol intoxication in state court.

2.      Alternatively, and assuming *arguendo* that Camarca is not precluded from relitigating the issue, whether the District Court properly concluded as a matter of law that there was probable cause for Woodward and Christen to arrest Camarca.

3.      Whether the undisputed material facts in the District Court record and governing precedent establish that Officers Woodward and Christen are entitled to qualified immunity on Camarca's false arrest and unlawful detention claims.

4.      Whether the District Court properly dismissed Camarca's Fourth amendment excessive force claim where the body worn camera footage and undisputed testimony in the record show that the force used by Officers Woodward and Christen to secure Camarca's arrest was reasonable under the circumstances.

5.    Alternatively, whether the District Court properly concluded that Officers Woodward and Christen were entitled to qualified immunity on Camarca's Fourth Amendment excessive force claim.

## STATEMENT OF THE CASE

This case arises from an interaction between the Appellant, Anthony Camarca ("Camarca"), and certain members of the Covington Police Department on October 17, 2021, at the Marriott Hotel in Covington, Kentucky. Camarca and his wife, Sara Camarca ("Sara") as well as other members of the wedding party were staying at the hotel that evening following Sara's brother's wedding and subsequent reception.

Before the ceremony, the wedding party, Sara, her sister (Layce) and brother (Charles) celebrated by drinking mimosas and beer. (R.42, C. Cummins Depo., PageID 507 – 509; R. 43, L. Cummins Depo., PageID 549; R. 47, S. Camarca Depo., PageID 913 – 914) Following the wedding, a reception was held at the Drees Center in Devou Park, where there was an open bar. (R. 41 A. Camarca Depo., PageID 434; R. 42, PageID 507; R. 43, PageID 549 – 550; R. 47, PageID 914 – 916) Layce drank several Jack-and-Cokes at the reception and, by all accounts, became "very intoxicated." (R. 42, PageID 510 – 511; R. 43, PageID 549 – 551; R. 47, PageID 917) Charles drank "probably two beers" at the reception. (R. 42, PageID 507 – 509) Camarca consumed "three to five beers," enough that it would not have been safe for him to drive a vehicle. (R. 41, PageID 435; R. 47, PageID 915 – 917) Sara claims not to have consumed any alcohol at

the reception, although Charles and Layce each testified they saw her drinking. (R. 41, PageID 509; R. 43, PageID 550; R. 47, PageID 915)

After the reception ended between 11:00 p.m. and midnight, the wedding party took a shuttle to the Courtyard by Marriott ("Marriott" or "hotel") on Third Street in Covington, Kentucky, where they had booked rooms for the night. (R. 41, PageID 436 – 438; R. 42, PageID 510; R. 43, PageID 552; R. 47, PageID 917, 919 – 921) From there, some members of the wedding party – including Camarca, Sara, Layce, Charles, Angela Fuller, Nicole Duell and Michael Gessendorf[1] – walked a few blocks to House of Orange, where they all consumed additional alcohol. (R. 38-1 Marriott Video;[2] R. 42, PageID 511 - 512; R. 43, 552 – 553; R. 47, PageID 921 – 923)

When House of Orange closed at 2:00 a.m., the wedding party walked back to the Marriott, where they gathered in a lounge that is part of the hotel lobby and continued to drink alcohol, some of which they purchased at the registration desk in the hotel lobby. (R.38-1 at 0:01:00 – 0:02:14; [3] R. 41, PageID 437 – 442, 444; R. 42, PageID 511, 513 – 514, 518; R. 43, PageID 553 – 555; R.

_____

[1] See R. 38, Defendants' Motion for Summary Judgment, at PageID 295 for descriptions of individuals in videos.

[2] All videos referenced were conventionally filed with the Court. (R. 40)

[3] The videos taken from cameras in the Marriott lobby do not have real-time stamps. Thus, the numbers referenced in those videos reflect the running time as indicated by the counter in the lower left corner of the screen.

47, PageID 919, 921, 923 – 925, 927) By the time they got back to the hotel, Layce was so intoxicated that things were "a little blurry but I wasn't totally blacked out yet." (R. 41, PageID 444 – 445; R. 42, PageID 515; Layce Depo., p. 19; Sara Depo., p. 33 – 34) Camarca and Sara were also intoxicated. (R. 41, PageID 445; R. 42, PageID 515; R. 47, PageID 943 – 944, 950)

Shortly before 3:30 a.m., while the group was still in the hotel lobby, Sara and Layce – who had a history of physically fighting each other – started arguing. (R. 41, PageID 443, 449; R. 42, PageID 514; R. 43, PageID 555; R. 47, PageID 928) The argument escalated, and Layce punched Sara in the face resulting in physical fight during which Layce and Sara were rolling around on the floor, cursing at each other, and throwing punches. (R. 41, PageID 444; R. 42, PageID 514 – 516; R. 43, PageID 556; R. 47, PageID 929 – 930) Charles eventually broke up the fight by grabbing Layce's arm and slinging her backwards and off of Sara. (R. 38-1 at 02:37 – 02:42; R. 41, PageID 445; R. 42, PageID 515; R. 43, PageID 557; R. 47, PageID 930 – 931) Charles then took Layce outside, where they sat under the portico near the hotel entrance. (R.38-1 at 0:02:50 – 0:02:59)

Meanwhile, the fight caught the attention of the hotel clerk, Gracie Wallace ("Wallace"), who stepped out from behind the registration desk to investigate. Wallace called 911 at 3:30:09 and reported the fight to dispatcher

Laura Cain. (R. 38-2, Call for Service Report;[4] R.38-3, 911 Audio at 0:02:30 – 0:02:42; R. 45, PageID 715) After identifying herself and providing her location, Wallace said: "I'm wondering if you can send officers to my location. I have people fighting in my lobby." (R. 38-3) Wallace answered "yes" when Cain asked her whether the fight was physical and continued: "One of the brothers broke it up but I don't know if it's going to continue. (R. 38-3) For my safety, I would feel a lot more comfortable if an officer came and told them that they either need to go to their rooms or leave. ... There's like a group of like seven of them. I lost count, there's like seven or ten of them. Only two of them are physically fighting. The rest of them are screaming." (R. 38-3) Wallace described the two who were fighting as "white females in black dresses," and explained: "They're intoxicated. They don't have any weapons, but they are intoxicated." (R. 38-3)

At 3:31:01, while Cain was still speaking with Wallace and making entries into the police communications system, dispatcher Julie White dispatched police officers – including Covington Police Officers Ross Woodward, Sam Mathews, Brad Morris and Ryan Christen – to the scene. (R.38-2)

Officer Woodward reached the Marriott at 3:33:05, and Officer Morris arrived a few seconds later. (R. 38-4, Woodward BWC at 3:33:05; R.38-5, Morris

---

[4] On the exhibit, Officer Woodward is "3C11;" Officer Mathews is "3C25;" Officer Morris is "3C21;" and, Officer Christen is "3C35."

BWC at 3:33:19) Upon exiting his cruiser, Officer Woodward saw Layce and Charles sitting on a curb under the portico, and Wallace standing on the sidewalk near the front entrance of the hotel. (R. 38-4 at 3:33:10 – 3:33:14; R. 45, PageID 715) Officer Woodward asked Officer Morris to speak with Layce and Charles. (R. 45, PageID 719) As Officer Woodward walked toward the front entrance, Wallace walked toward him. She told him that Layce was "one of them" and provided a description and the location of "the other lady," i.e., Sara. (R. 38-4 at 3:33:13 – 3:33:26) Officer Woodward entered the hotel to investigate, while Officer Morris remained outside with Layce and Charles. (R. 38-4 at 3:33:26; R. 38-5 at 3:33:25 – 3:34:25)

Officer Woodward walked past the registration desk and into the lounge, where he encountered a group that included Sara, Gessendorf, Duell, Fuller, Camarca, and several others, who noticed his presence. (R.38-1 at 0:06:54 – 0:07:02; R. 38-4 at 3:33:29 – 3:33:40; R.38-6, Marriott Video 2 at 0:00 – 00:09)

Three members of the group left as Sara and Gessendorf gestured toward the door and said: "It's all her fault." (R. 38-4 at 3:33:43 – 3:33:47) To those who remained in the lounge, Officer Woodward asked: "Who has rooms here? Who has rooms here?" (R. 38-4 at 3:33:45 – 3:33:49) Several members of the group raised their hands, and Sara said: "We all do." (R. 38-4 at 3:33:49 – 3:33:50) Officer Woodward told everyone to go to their rooms and remain

there for the rest of the night – an instruction to which Camarca responded by laughing – but Officer Woodward pointed to Sara and asked her to remain so he could investigate and get her side of the story about the fight. (R. 38-4 at 3:33:50 – 3:33:59; R. 41, PageID 452 – 454; R. 45, PageID 723 – 724, 726 – 727; R. 47, PageID 933, 935 – 936, 947 - 948) Sara leaned closer to Officer Woodward to clarify that he wanted her to remain, and Officer Woodward said: "You're not free to leave yet." (R. 38-1 at 0:07:25 – 0:07:26; R. 38-4 at 3:33:59 – 3:34:02; R. 47, PageID 933, 935 – 936) Camarca was looking directly at Officer Woodward when he gave that instruction, be Camarca continued to laugh. (R. 38-4 at 3:34:00 – 3:34:02) Sara said sarcastically, "Oh, okay," and began moving a few steps away from the group. (R. 38-1 at 0:07:28 – 0:07:32; R. 38-4 at 3:34:02 – 3:34:04) Officer Woodward wanted to put some distance between Sara and the group, because he thought he would be better able to hear her if they were away from the group, which he perceived as "a little bit rowdy." (R. 45, PageID 723)

At that point, Camarca intervened and objected. (R. 41, PageID 452; R. 47, PageID 933) He said: "You said what?" (R. 38-4 at 3:34:03 – 3:34:05) Sara responded: "I'm not free to leave." (R. 38-4 at 3:34:04 – 3:34:05) That prompted Gessendorf and Camarca to speak at the same time, and Officer Woodward told them: "This doesn't concern you. Beat it." (R. 38-4 at 3:34:05 –

3:34:06) Gessendorf, Camarca and Sara all began speaking at the same time, when Sara abruptly turned toward Officer Woodward, pointed at Camarca and said: "It is my husband so it does concern him." (R. 38-4 at 3:34:06 – 3:34:10; R. 41, PageID 452; R. 47, 933) In fact, Sara and Camarca repeatedly, vociferously, and simultaneously insisted that "this does concern" Camarca. (R. 38-4 at 3:34:08 – 3:34:17)

As Sara and Camarca exhibited escalating tones and demeanors, Fuller intervened and tried to calm them down ; she stepped into the space between Camarca and Officer Woodward with her arm straight out in front of Camarca, and she warned Sara and Camarca not to be rude. (R. 38-4 at 3:34:09 – 3:34:17) Sara pointed at Officer Woodward and erupted: "No, he was rude for saying it." (R. 38-4 at 3:34:13 – 3:34:16; R. 38-7, Christen BWC at 3:34:11 – 3:34:13)[5] Camarca then took an aggressive step toward Officer Woodward and angrily called him "a piece of shit" before saying "we're going to our rooms." (R. 38-4 at 3:34:15 – 3:34:18; R.38-7 at 3:34:14 – 3:34:18; R. 41, PageID 455) At this point, Fuller had her hand on Camarca's chest to prevent him from advancing further toward Officer Woodward. (R. 38-4 at 3:34:14 – 3:34:17)

---

[5] Officer Christen arrived at the Marriott at 3:33:46 and entered the hotel at 3:34:11. (R.38-1 at 0:07:38-0:07:40; R.38-6 at 0:00:47-0:00:55; R. 38-7)

Camarca moved swiftly behind and around Fuller toward Sara, grabbed her and ushered her toward the hotel's guest rooms, telling Officer Woodward "goodbye" in the process. (R. 38-4 at 3:34:18 – 3:34:21; R.38-7 at 3:34:14 – 3:34:18; R. 41, PageID 452 – 453, 460) As Camarca did so, Officer Woodward said: "No, you're not free to leave yet." (R. 38-4 at 3:34:19 – 3:34:21; R. 38-7 at 3:34:19 – 3:34:21; R. 41, PageID 455; R. 45, PageID 727) Camarca yelled, "Yes, I am free to leave, you can suck a dick," while pulling Sara toward the guest rooms. (R. 38-4 at 3:34:21 – 3:34:22; R. 38-7 at 3:34:21 – 3:34:22; R. 41, PageID 460; R. 45, PageID 727; R. 47, PageID 947 – 948) Simultaneously, Fuller said, "No, Tony!" and Officer Woodward told Camarca that now *he* was not free to leave either. (R. 38-4 at 3:34:21 – 3:34:22; R. 45, PageID 727, 762, 783 – 784, 789) Camarca ignored the command and continued to try and remove Sara from the lobby, telling Officer Woodward to "go fuck" himself. (R. 38-4 at 3:34:21 – 3:34:23; R. 41, PageID 486; R. 47, PageID 936, 945; R.45, PageID 727, 728, 762)

Officer Woodward perceived Camarca's actions as "trying to take [Sara] away from me while I'm doing an investigation." (R. 45, PageID 725, 761 – 762, 765, 784) And, that was, in fact, Camarca's intention. Camarca testified that he knew Officer Woodward had told Sara to remain in the lobby to investigate the

fight, and that, when he attempted to remove Sara from the lobby, he intended to defy Officer Woodward's order. (R. 41, PageID 452 – 453, 460)

Intending to arrest Camarca and to prevent him from returning to the guest rooms with Sara, Officer Woodward, who was behind Camarca, placed a hand on each side of Camarca's upper body. (R. 38-7 at 3:34:22) When Camarca pulled away, Officer Woodward tried to control him by placing him against a nearby wall. (R. 38-7 at 3:34:22 – 3:34:23; R. 45, PageID 729, 794) Camarca turned and pushed off the wall with his right forearm, causing both himself and Officer Woodward to lose their balance and fall to the floor. (R. 38-1 at 0:07:50 – 0:07:52; R. 38-7 at 3:34:23 – 3:34:25; R. 45, PageID 729, 794, 807) While on the floor, Camarca continued resisting Officer Woodward's efforts to arrest him by turning on his side, kicking his legs and trying to get up. (R. 38-1 at 07:51 – 07:56; R. 38-7 at 3:34:27 – 3:34:28) As Officer Woodward tried to control Camarca, Gessendorf approached and reached down to pull Officer Woodward off Camarca. (R. 38-1 at 0:07:54-07:55; R. 38-7 at 3:34:26-3:34:29; R. 46, PageID 844 – 845) So did Sara, prompting Officer Christen to extend his right arm to the side to sweep her away. (R. 38-1 at 07:51 – 08:05; R. 38-5 at 3:34:31 – 3:34:32; R. 38-7 at 3:34:28 – 3:34:29; R. 46, PageID 844 - 845) Fuller was hovering over Officer Woodward and Camarca, close enough to them to physically interfere with the arrest. (R. 38-1 at 0:07:54 – 0:07:55)

Meanwhile, Officer Morris, who had been outside speaking with Layce and Charles, told them he needed to go inside to see what was happening with Officer Woodward's investigation. (R. 38-5 at 3:34:10 – 3:34:20) He began walking toward the hotel's entrance. (R. 38-5 at 3:34:18 – 3:34:25) The automatic sliding glass door opened as he reached it, and, he immediately heard a commotion coming from inside the hotel (R. 38-5 at 3:34:25 – 3:34:27) Seeing Officer Woodward on the floor struggling to control Camarca, Officer Morris pushed the second automatic sliding glass door so it would open faster, and entered the lobby. (R. 38-5 at 3:34:27 – 3:34:30; R. 38-6 at 0:01:01 – 0:01:04) He hurried toward Officer Woodward and Camarca, reaching them just as Gessendorf and Sara were physically interfering with Officer Woodward's ability to control Camarca, and just as Officer Christen was sweeping Sara away from the fray with his right arm. (R. 38-1 at 0:07:54 – 0:07:55; R. 38-5 at 3:34:29 – 3:34:32; R. 38-6 at 0:01:03 – 0:01:04) As he did, Camarca was still resisting arrest, by propping himself up off the floor with his forearms and trying to get up. (R. 38-1 at 0:07:51 – 0:07:56; R. 38-5 at 3:34:30) Officer Morris approached Sara, Gessendorf and Fuller with his taser and ordered them to back away from Officer Woodward and Camarca. (R. 38-5 at 3:34:32 – 3:34:37)

As Officer Woodward continued struggling to control him, Camarca rose to his knees, requiring Officer Woodward to try and bring him to the floor again.

(R. 38-1 at 0:07:57 – 0:07:59; R. 38-7 at 3:34:31 – 3:34:33) During this part of the fray, Camarca balled his right fist (R. 38-7 at 3:34:32), twice placed his left hand on Officer Christen's wrist (R. 38-7 at 3:34:30 and 3:34:33), and knelt on all fours instead of surrendering and going to the ground. (R. 38-1 at 0:07:57 – 0:07:59). Officer Woodward put his hand on the back of Camarca's head to try and force him to the ground. (R. 38-7 at 3:34:32 – 3:34:33) Again, though, Camarca resisted raising his body up off the ground. (R. 38-1 0:08:00 – 0:08:04; R. 38-7 at 3:34:34 – 3:34:35) At that point, Charles – who had run back inside after hearing commotion coming from inside the lobby – approached the fray, placing himself immediately next to Officer Woodward. (R. 38-1 at 08:00 – 08:03; R. 38-6 at 0:01:08 – 0:01:09; R. 38-7 at 03:34:34 – 03:34:37; R. 42, PageID 522) Officer Morris briefly turned around and ordered Charles to move, at which point, Sara moved toward the fray again. (R. 38-5 at 3:34:38 – 3:34:41; R. 38-7 at 3:34:37 – 3:34:41) As Officer Mathews – who had entered the hotel just behind Charles and ran to the location of Camarca's arrest – grabbed Charles and pushed him away from Officer Woodward and Camarca, Officer Morris turned back toward Sara and again warned her to step back. (R. 38-1 at 0:08:03 – 0:08:05; R. 38-5 at 3:34:37 – 3:34:41; R. 38-6 at 0:01:10 – 0:01:12,

0:01:14 – 0:01:15)[6] Sara and Gessendorf began screaming at Officer Morris, until Officer Mathews eventually arrested her. (R. 38-5 at 3:34:41 – 3:35:17)

As Officers Morris and Mathews dealt with Sara, Gessendorf and Charles, Camarca continued to resist Officer Woodward's efforts to control him by propping up his upper body with his forearms, continuing to roll on the floor, and continuing to move his legs. (R. 38-1 at 0:08:02 – 0:08:05; R. 38-7 at 3:34:39 – 3:34:42) With Camarca's forearms on the floor supporting his body weight, and given that Camarca was still resisting the process, it was difficult for Officer Woodward to apply handcuffs. (R. 38-1 at 0:08:05 – 0:08:31; R. 38-7 at 3:34:39 – 3:35:12; R. 45, PageID 730; R. 46, PageID 844, 883 – 884) Therefore, Officer Christen assisted in accomplishing the handcuffing. (R. 38-1 at 0:08:05 – 0:08:31; R. 38-7 at 3:34:42 – 3:35:12; R. 41, PageID 461; R. 46, PageID 841, 851; R. 47, PageID 934, 939 – 940)

During the entire encounter, Camarca continuously cursed at and threatened Officers Woodward and Christen, shouting "fuck you," "I'll beat your ass," "you bitch," "you fucking cocksucker," "you fucking piece of shit," "faggot," and other profanities. (R. 38-7 at 3:34:22 – 3:35:35; R. 41, PageID 457, 467 – 468) In addition, Sara, Fuller, and Gessendorf continuously screamed. (R. 38-7

---

[6] Layce entered the hotel at about this time. (R. 38-6 at 0:01:16)

14

at 3:34:22 – 3:35:35) Camarca also repeatedly yelled at Charles to "call my fucking lawyer." (R. 38-7 at 3:35:12 – 3:35:35)

Once Camarca had been handcuffed, Officer Woodward searched him, turned him into a sitting position, and helped him to his feet in preparation for escorting him outside. (R. 38-1 at 0:08:52 – 0:09:02; R. 38-5 at 3:35:35 – 3:35:36; R. 38-7 at 3:35:35) When he did so, Camarca started to fall. (R. 38-1 at 0:09:03 – 0:09:04; R. 38-5 at 3:35:37 – 3:35:40; R. 38-7 at 3:35:37) To avoid being brought to the ground with Camarca, Officer Woodward – who had a tenuous grip on Camarca – stopped trying to hold on to him. (R. 38-1 at 0:09:04 – 0:09:06; R. 45, PageID 738 – 740) As Camarca fell, and after he was on the ground, he accused Officer Woodward of breaking his leg. (R. 38-5 at 3:35:41 – 3:36:23; R. 38-7 at 3:35:36 – 3:35:48)

According to Officers Christen and Woodward, there was no visible indication supporting Camarca's statement that his leg was broken. (R. 45, PageID 743; R. 46, PageID 855 – 857) Because there was no visible injury to Camaraca's leg, because offenders – especially those who resist being taken into custody – often fake injury to delay or avoid going to jail, and because nothing had happened during the course of the arrest that gave them reason to believe Camarca's leg had been broken, neither Officer Woodward nor Officer Christen

believed Camarca's leg was actually broken. (R.45, PageID 743 – 745; R. 46, PageID 856 – 857)

Instead, believing it was important to remove Camarca from the hotel, since emotions were running high inside, Officers Woodward and Christen decided to escort Camarca outside. (R. 45, PageID 743 – 745; R. 46, PageID 856 – 857) Supporting Camarca's weight by holding him under each armpit, Officers Woodward and Christen "more or less carried him outside," where they placed him on a curb under the portico. (R. 38-1 at 0:09:52 – 0:10:07; R. 38-5 at 3:36:34 – 3:36:52; R. 38-7 at 3:36:40 – 3:37:14; R. 41, PageID 468 - 470; R. 42, PageID 525 - 526; R. 47, PageID 935) Officer Morris remained inside the hotel with Charles and Layce. (R. 38-5 at 3:36:47 – 3:37:35) After Officer Morris instructed Charles and Layce to go back to their rooms, Charles stood up from a couch, stepped toward Officer Morris, and demanded to call a lawyer for Sara. (R. 38-5 at 3:37:36 – 3:37:54) As he did, Officer Morris repeated his instruction for Charles and Layce to go to their rooms. (R. 38-5 at 3:37:36 – 3:37:54) Because he had refused Officer Morris' instruction, Officer Morris and Sergeant Gilliland arrested Charles, who continued to argue and briefly resisted being placed in handcuffs. (R. 38-5 at 3:37:53 – 3:38:20)

By the time they placed Camarca into a seated position under the portico outside, Officers Woodward and Christen had observed Camarca on their way

outside and believed his difficulty walking was genuine; thus, they began to consider whether Camarca might actually be injured. (R. 45, PageID 745 – 747; R. 46, PageID 855 – 857, 875) Officer Christen, therefore, promptly asked dispatchers to send an ambulance to evaluate Camarca's leg. (R. 38-2; R. 38-4 at 3:40:03 – 3:40:19; R. 38-7 at 3:40:07 – 3:40:20; R. 45, PageID 734, 799; R. 46, PageID 855 – 856, 858, 879 – 880)

The ambulance arrived at approximately 3:45:24. (R. 38-7 at 3:45:24; R. 38-4 at 3:45:28) After speaking with Camarca and examining his ankle, a paramedic told Camarca "that's not broken," but "I think you rolled your ankle." (R. 38-4 at 3:46:01 – 3:47:23) Erring on the side of caution, however, paramedics transported Camarca to the hospital, where doctors determined he had actually broken his leg. (R. 41, PageID 475)

Camarca was charged with alcohol intoxication, resisting arrest, disorderly conduct, and menacing. (R. 38-8, Uniform Citation) He pleaded guilty to an amended charge of public intoxication in exchange for the dismissal of the remaining charges. (R. 41, PageID 481 – 482) Charles was charged with disorderly conduct and pled guilty to an amended charge of alcohol intoxication in a public place. Sara was charged with alcohol intoxication in a public place and disorderly conduct and took diversion.

Camarca brought this suit against Officers Woodward, Christen, Morris, Mathews, and Gilliland and asserted claims, pursuant to 42 USC § 1983, for unlawful detention, unlawful arrest, unlawful search, excessive force, denial of right to counsel, and violation of equal protection rights. (R.1 Complaint, Count II) Camarca also asserted *Monell* claims against the City of Covington for the alleged violations of his constitutional rights. (R.1 Complaint, Count I and III) Finally, Camarca asserted state-law causes of action for assault and battery against Officers Woodward and Christen (R.1 Complaint, Count IV), and for outrage against all of the officers (R.1 Complaint, Count V).

After the completion of discovery, the District Court concluded there were no genuine issues of material fact and granted summary judgment to Defendants on all of Camarca's claims. (R. 60, Opinion & Order, PageID 1338 – 1356; R. 61, Judgment, PageID 1357)

This appeal followed.

<u>**SUMMARY OF THE ARGUMENT**</u>

1.     The District Court properly granted summary judgment to Officers Woodward and Christen on Camarca's false arrest and unlawful detention claim. Beyond the fact that Camarca is collaterally estopped from bringing these claims due to his guilty plea in state court, the undisputed material facts demonstrate that his detention and arrest was supported by probable cause.

2.     Assuming *arguendo* that Camarca's false arrest and unlawful detention claims are not barred by claim preclusion, and assuming *arguendo* Officers Woodward and Christen did not have probable cause to arrest him, the District Court nonetheless properly granted summary judgment because the officers are entitled to qualified immunity. Not only did Camarca fail to identify the constitutional right he alleges was violated, he cannot point to any precedent which clearly establishes that a person has a Fourth Amendment right not to be arrested when he attempts to physically remove a witness whom a police officer has ordered to remain present for questioning about a reported crime.

3.     The District Court properly granted summary judgment on Camarca's excessive force claim against Officers Woodward and Christen. When analyzing interactions with multiple uses of force, the Court analyzes the subject in segments to assess the reasonableness of the officers' actions. *King v. City of Rockford*, 97 F.4th 379 (6th Cir. 2024). Accordingly, Officer Wooward did not use excessive force when he pushed Camarca towards the wall in an effort to control him. When looking at the totality of the circumstances including Camarca's agitated gestures, profanity, degree of intoxication, and menacing advance towards Officer Woodward, it was reasonable for Officer Woodward to believe Camarca was a safety risk.

4.     Officers Woodward and Christen likewise did not use excessive force when taking Camarca to the ground and placing him under arrest. The video evidence shows that Camarca was actively resisting the officers' attempt to arrest him. Camarca can be seen in the body camera footage locking up his body to avoid being detained while simultaneously reaching toward Officer Christen's neck/upper chest area. (R. 38-7 at 3:34:35) On facts like these, law enforcement officers have wide latitude in employing the force necessary to gain control over such uncooperative, verbally hostile, and physically resistive individuals. *See e.g., Rudlaff v. Gillispie,* 791 F.3d 638, 639 (6th Cir. 2015).

5.     After Camarca was cuffed, Officer Woodward did not use excessive force when he released his grip on Camarca as he fell to the ground. After Officer Woodward placed Camarca in handcuffs and began picking him up off the floor to escort him out of the hotel, he lost his grip causing Camarca to fall. While Camarca claims that Officer Woodward shoved him headfirst into the wall, the videotape evidence flatly refutes this contention.

6.     Officers Woodward and Christen did not use excessive force when they exited the hotel with Camarca. Camarca claims that by forcing him to walk, or hop, on a broken leg, the officers used excessive force. But, the video evidence clearly depicts Camarca hopping out of the lobby on his *non-injured leg,* with Officers Woodward and Christen on each side assisting him.

Furthermore, at this point in the interaction, there was no application of force by the officers.

7.    Alternatively, the District Court properly concluded that Officers Woodward and Christen were entitled to qualified immunity on Camarca's Fourth Amendment excessive force claim.

8.    The District Court properly granted summary judgment on Camarca's claim for failure to intervene against Officers Morris, Mathews, and Gilliland. They did not have a duty to intervene because they could not have known that the force was unreasonable and even if they did, they did not have the time or opportunity to stop it. Alternatively, Officers Morris, Mathews and Gilliland are entitled to qualified immunity because they did not violate any clearly established right of Camarca.

9.    The District Court properly granted summary judgment on Camarca's equal protection and due process claims. On appeal, Camarca argues that he was treated disparately from the other individuals who were present in the hotel lobby that night and acting similarly to him. Assuming *arguendo* that Camarca did in fact experience disparate treatment, Camarca nonetheless failed to properly allege any that the officers lacked any "rational basis" to arrest and use force against him sufficient to establish an equal protection claim.

10. The District Court properly granted summary judgment on Camarca's 42 U.S.C. § 1983 claims against the City and the officers in their official capacity. Assuming *arguendo* that the officers violated Camarca's constitutional rights, his claim nonetheless fails because he failed to identify an actual policy or custom which the City violated. Camarca alleges generally that the officers did not have the requisite training on the use of force and, specifically, contends that Officer Woodward did not have the required training, citing his expert's report. However, the fact that Camarca's expert was not provided with information as to *whether* Officer Woodward was trained on manual force techniques does not establish that Officer Woodward was *not* trained on such techniques. Camarca has failed to show that the District Court erred by dismissing his *Monell* claim for lack of requisite proof.

11. The District Court properly granted summary judgment on Camarca's state law tort and punitive damages claims. As to Camarca's claim for punitive damages, he fails to make any argument supporting his contention that the District Court's ruling should be reversed. In addition, a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action. *Dalton v. Animas Corp.,* 913 F. Supp. 2d 370 citing *Toon v. City of Hopkinsville,* 2011 U.S. Dist. LEXIS 40830. As for Camarca's claims of assault and battery, Officers Woodward and Christen are

not liable because, as demonstrated, the arrest was lawful, and they used no more force than was reasonably necessary under the circumstances to effectuate the arrest. Finally, as to the tort of outrage, a claim for the tort of outrage must be dismissed when the facts alleged, if proven to be true, give rise to one or more traditional torts. *Rigazio v. Archidiocese of Louisville,* 853 S.W.2d 295 (Ky. App. 1993). Camarca fails to make a meaningful argument in opposition and instead, merely contends that he the Court has jurisdiction over the state-law claims under 28 U.S.C. § 1387. (Appellant Brief, p. 51) Absent any substantive arguments for reversal, the District Court's decision must stand.

12.    The District Court correctly dismissed Camarca's Equal Protection and Due Process claims, a well as his state law tort claims, for lack of proof to support them.

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON CAMARCA'S CLAIMS AGAINST OFFICERS WOODWARD AND CHRISTEN FOR FALSE ARREST AND UNLAWFUL DETENTION

While Camarca originally asserted § 1983 claims for false arrest and unlawful detention against all officers in their individual capacity, on appeal he only challenges the District Court's decision as to Officers Woodward and Christen.

## A.  CAMARCA IS COLLATERALLY ESTOPPED FROM BRINGING CLAIMS FOR FALSE ARREST OR UNLAWFUL DETENTION

To prevail on a § 1983 false arrest or unlawful detention claim, a plaintiff must establish that there was no probable cause for his arrest. *Buttino v. City of Hamtramck*, 87 Fed. Appx. 499 (6th Cir. 2004); *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988). However, a § 1983 plaintiff who pleads guilty in a state criminal case is collaterally estopped from relitigating the existence of probable cause, because that issue has already been decided by the state court. *Chaney-Snell v. Young*, 98 F.4th 699 (6th Cir. 2024), citing *Spencer v. County of Huron*, 717 Fed. Appx. 555 (6th Cir. 2017); *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997); *Gray v. Lexington-Fayette Urban Co. Govt.*, 2013 U.S. Dist. LEXIS 91904 (E.D. Ky.); *Everage v. Whitaker*, 2006 U.S. Dist. LEXIS 13434 (E.D. Ky.).

Camarca pleaded guilty to public intoxication. His guilty plea therefore precludes him from relitigating the issue of probable cause. Accordingly, the District Court's decision dismissing Camarca's false arrest and unlawful detention claims must be affirmed.

## B.  CAMARCA'S DETENTION AND ARREST WERE SUPPORTED BY PROBABLE CAUSE

Assuming, *arguendo* that Camarca could properly bring his claims against Officers Woodward and Christen for false arrest and unlawful detention, the District Court nonetheless appropriately granted summary judgment because

Officers Woodward and Christen had probable cause to detain and arrest Camarca for intentional interference of a governmental function (KRS 519.020) and public intoxication (KRS 222.202(1)).

To arrest a person, an officer must have probable cause to believe the person was about to commit, or was in the process of committing, or has already committed, a crime. *Crockett v. Cumberland College*, 316 F.3d 571 (6th Cir. 2003). Probable cause is not a high bar and can be found if, based on the facts and circumstances known to the officer at the time, there is a "fair probability" that the individual to be arrested has either committed or intends to commit a crime. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001).

Under Kentucky law, it is a crime to "intentionally obstruct[], impair[] or hinder[] the performance of a governmental function by using or threatening to use violence, force or physical interference." KRS 519.020. Here, Officers Woodward and Christen were dispatched to respond to a fight at the Marriott. Upon arrival, Officer Woodward entered the lobby of the Mariott and after meeting some of the individuals who were involved or otherwise witnessed the altercation, ordered everyone *except* Sara to go to their rooms. Officer Woodward specifically ordered Sara to stay behind so that he could properly investigate the fight in which he was dispatched. (R. 38-4 at 3:33:39 – 3:34:04; R. 45, PageID 719, 721 – 722, 725, 727; R. 47, PageID 947 – 948) Subsequently,

Officer Christen entered the lobby and, based on his observations of the scene, saw Officer Woodward ordering Sara to remain in the lobby so that he could speak with her while everyone else was ordered to go up to their rooms. (R. 46, PageID 839)

Camarca was present and therefore knew that Officer Woodward had ordered everyone but Sara to go to their rooms. Camarca argues that Officer Woodward gave "conflicting statements within a matter of seconds" and therefore, he was confused and did not intentionally disobey the instructions. However, given the fact that Camarca was present upon both Officers' arrivals, was told by Sara herself that she was told to stay behind while others went to their room (R. 38-4 at 3:34:04 – 3:34:05), and Officer Woodward explicitly told Camarca that he was no longer free to leave, (R. 38-4 at 3:34:19 – 3:34:21, R. 38-7 at 3:34:19 – 3:34:21; R. 41, PageID 455; R. 45, PageID 727) Camarca nonetheless continued to remove Sara and himself from the situation. Furthermore, Camarca's alleged confusion is debunked because he admitted he engaged in that conduct with the intention of defying Officer Woodward's order to prevent him from speaking with Sara about the fight. (R. 41, PageID 452 – 453, 460)

Accordingly, despite Officer Woodward's direct orders that Sara stay in the lobby, Camarca insisted that Sara go up to their room with him and, in doing

so, physically grabbed Sara and turned her away from Officer Woodward. (*Id.*)
Seeing that Camarca was attempting to remove Sara from the lobby, Officer
Woodward further reiterated his orders by stating that Sara was not free to
leave. (*Id.*)

Under these facts, a prudent officer would have believed that Camarca
was removing Sara from the situation. On appeal, Camarca argues that he was
not actually grabbing Sara and that it was Sara who was trying to keep a hold
onto Camarca's hand. Regardless of whose hand was where, based on the facts
and circumstances – including Camarca's verbal statements such as "we're
going to our rooms," (R. 38-4 at 3:34:15 – 3:34:18; R. 38-7 at 3:34:14 – 3:34:18;
R. 41, PageID 455) "goodbye," (R. 38-4 at 3:34:18 – 3:34:21; R. 38-7 at 3:34:14
– 3:34:18; R. 41, PageID 452 – 453, 460) and "yes, I am free to leave, you can
suck a dick" (R. 38-4 at 3:34:21 – 3:34:22; R. 38-7 at 3:34:21 – 3:34:22; R. 41,
PageID 460; R. 45, PageID 727; R. 47, PageID 947 - 948), it was reasonable for
Officer Woodward to believe that Camarca was interfering with the
performance of a governmental function – i.e., investigating a reported crime.
Therefore, only one conclusion can be reached – that Officers Woodward and
Christen had probable cause to detain and arrest Camarca for violating KRS
519.020.

Alternatively, under Kentucky law, it is a crime to "appear[] in a public place manifestly under the influence of alcohol to the degree that [one] may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity." KRS 222.202(1). Camarca was, as a matter of law, in a public place at the time of his arrest because hotel lobbies are included within the definition "public place" in KRS 525.010(3).

Camarca argues that the Officers did not have a basis for believing that he was intoxicated because the hotel clerk did not inform the Officers of anyone's intoxication and the Officers could not have known that Camarca was intoxicated because the interaction before his arrest was too brief for any conclusions to be made. (Appellant Brief, p. 18 – 19) That contention is refuted by the record evidence. First, the Officers were informed by the dispatcher that everyone present was intoxicated. (R. 38-2; R. 45, PageID 771; R. 46, PageID 869) Therefore, even if the hotel clerk, Gracie Wallace, did not inform the Officers, the Officers were nonetheless briefed on the situation by dispatch. Second, even if the interaction was brief, Camarca – as well as the other individuals present – were exhibiting signs of intoxication such as slurred speech. Therefore, any reasonable person would have suspected that Camarca was under the influence.

Finally, since Wallace was unable to conduct any work and because at least three hotel guests had to remain outside during this interaction, Camarca was already unreasonably annoying persons in his vicinity and would likely continue to do so. (R. 38-5 at 3:34:18 – 3:34:24, 3:35:21 – 3:35:51; R. 38-7at 3:35:50 – 3:36:35, 3:36:44 – 3:36:47) Alternatively, even if Camarca was not causing a disturbance to others, it was reasonable for Officer Woodward to be worried about Camarca's actions. "As any bartender knows (and this Court has acknowledged), drunk persons re generally unpredictable. Alcohol shortens fuses and clouds judgment." *Cunningham v. Packard,* 2023 U.S. App. LEXIS 28377 (6TH Cir.), citing *Marvin v. City of Taylor,* 509 F.3d 234 (6th Cir. 2007). Therefore, a reasonable jury could only conclude that Officers Woodward and Christen had probable cause to arrest Camarca for alcohol intoxication.

Based on the foregoing, the District Court properly found that there was no genuine issue of material fact as to whether Officers Woodward and Christen had reasonable suspicion and probable cause to justify Camarca's detention and arrest.

## C.   ALTERNATIVELY, THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

Assuming *arguendo* that Camarca's false arrest and unlawful detention claims are not barred by his guilty plea, and assuming further that Officers

Woodward and Christen did not have probable cause to arrest Camarca, the District Court nonetheless properly granted summary judgment to Officers Woodward and Christen because they are entitled to qualified immunity.

Qualified immunity shields police officers from liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223 (2009). A qualified immunity inquiry involves two questions: (1) whether the defendant in question violated a constitutional (or federal statutory) right, and (2) whether that right was clearly established at the time of the defendant's conduct. *Id*. If either inquiry is resolved in the negative, i.e. if the defendant did not violate the plaintiff's constitutional right, or if the right in question was not clearly established, the defendant is entitled to qualified immunity. *Id*. The plaintiff bears the burden of showing the law was clearly established at the time of the alleged violation. *Bambach v. Moegle*, 92 F.4th 615 (6th Cir. 2024).

On appeal, Camarca fails to identify the clearly established constitutional rights the Officers violated and instead simply insists that his seizure and arrest was unlawful and that the Officers used excessive force. Notwithstanding the vagueness of his argument Camarca fails to establish that the right was "clearly established" at the time of the Officer's conduct at the hotel.

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48 (2018). It is not enough that the rule is suggested by then-existing precedent. *Id*. While there does not have to be "a case directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established. *Id*. "Qualified immunity, after all, must give government Officers breathing room to make reasonable but mistaken judgments." *Barnett v. Smithwick*, 835 Fed. Appx. 31 (6th Cir. 2020), citing *Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016).

Under these parameters, Officers Woodward and Christen are entitled to qualified immunity. Camarca cannot point to any precedent which clearly establishes that a person has a Fourth Amendment right not to be arrested when he attempts to physically remove a witness whom a police officer has ordered to remain present for questioning about a reported crime.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON CAMARCA'S EXCESSIVE FORCE CLAIM AGAINST OFFICERS WOODWARD AND CHRISTEN

While Camarca originally asserted a 42 U.S.C. § 1983 Fourth Amendment excessive force claim against all officers in their individual capacity, on appeal,

he only challenges the District Court's dismissal of his claims against Officers Woodward and Christen.

The Fourth Amendment protects a person's right to be free from unreasonable seizures, including the right to be free from excessive force by police during a seizure. *Graham v. Connor*, 490 U.S. 386 (1989). To decide whether the force was excessive, courts consider the totality of the circumstances, including, but not limited to:  (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting or attempting to evade arrest by flight. *Graham, supra*; *King, supra; Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017). The reasonableness of the use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of 20/20 hindsight. *King, supra*. The demeanor of the suspect and whether he was "intoxicated and noncompliant," are also relevant factors, while the "extent of the injury inflicted" is not a crucial factor. *Davenport v. Causey,* 521 F.3d 544, 551 (6th Cir. 2008); *Miller v. Sanilac City.,* 606 F.3d 240, 252 (6th Cir. 2010).

When analyzing interactions with multiple uses of force, the Court analyzes the subject in segments to assess the reasonableness of the officers' actions. *King,* 97 F.4th at 393. At bar, the force-segments can be broken down

as follows: (i) Officer Woodward pushing Camarca towards the wall; (ii) Officers Woodward and Christen taking Camarca to the ground in an effort to place him under arrest; (iii) Officer Woodward releasing his grip on Camarca as he fell; and (iv) the Officers forcing Camarca to hop on his non-injured leg while exiting the hotel.

### A.   OFFICER WOODWARD DID NOT USE EXCESSIVE FORCE WHEN HE PUSHED CAMARCA TOWARDS THE WALL

Despite Officer Woodward's direct orders that Sara stay in the hotel lobby, Camarca insisted that Sara go up to their room with him and, in doing so, physically grabbed Sara and turned her away from Officer Woodward. (R. 41, PageID 452 – 453, 460) Seeing that Camarca was attempting to remove Sara from the lobby, Officer Woodward began to arrest Camarca by placing a hand on each side of Camarca's upper body and when Camarca pulled away, Officer Woodward tried to control him by placing him against a nearby wall. (R. 38-7 at 3:34:22 – 3:34:23; R. 45, PageID 729, 794) Based on the totality of the circumstances, Officer Woodward's push was reasonable.

Camarca argues that "mere agitated hand gestures and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety." *King v. City of Rockford,* 97 F.4th 379, 395 (6th Cir. 2024) (citing *Shumate v. City of Adrian,* 44 F.4th 427 (6th Cir.

2022) (citing *Kent v. Oakland Cnty.,* 810 F.3d 384 (6th Cir. 2016)). Camarca's agitated gestures and profanity were, however, accompanied by a threat – though not a verbal threat – in the form of Camarca's menacing advance towards Officer Woodward. Furthermore, because of Camarca's suspected intoxication level, it was reasonable for Officer Woodward to be worried about Camarca's actions. "As any bartender knows (and this Court has acknowledged), drunk persons re generally unpredictable. Alcohol shortens fuses and clouds judgment." *Cunningham v. Packard,* 2023 U.S. App. LEXIS 28377 (6ᵀᴴ Cir.), citing *Marvin v. City of Taylor,* 509 F.3d 234 (6th Cir. 2007). Additionally, where an arrestee's family is in the vicinity, an officer may reasonably fear that a confrontation with the arrestee could escalate. *Id.* Therefore, a reasonable officer at this scene would have easily concluded that Camarca posed a safety threat.

Furthermore, a suspect who refuses an officer's order and walks away can reasonably be considered to flee, even where the suspect does not run. *Thomas v. City of Eastpointe,* 715 Fed. Appx. 458 (6th Cir. 2017). Camarca overtly ignored Officer Woodward's orders and made attempts to walk away and take Sara with him. Furthermore, even if, as Camarca argues, he was confused and did not intend to ignore Officer Woodward's orders, that argument is irrelevant because the analysis for excessive force does not ask

how the suspect perceived the situation. *See Cunningham v. Packard,* 2023 U.S. App. LEXIS 28377 (6th Cir.). Instead, the circumstances must be viewed from the perspective of a reasonable officer on the scene. Here, a reasonable officer in Officer Woodward's position would have believed that Camarca was intending to leave the scene. Officer Woodward gave clear instructions to both Camarca and his wife and reminded him on numerous occasions that he was not permitted to leave. Despite those clear, direct communications, Camarca still attempted to leave.[7] Therefore, a reasonable officer would have perceived Camarca's conduct as an overt attempt to flee from an investigation.

---

[7] Camarca moved swiftly behind and around Fuller toward Sara, grabbed her and began to usher her toward the hotel's guest rooms, telling Officer Woodward "goodbye" in the process. (R. 38-4 at 3:34:18 – 3:34:21; R. 38-7 at 3:34:14 – 3:34:18; R. 41, PageID 452 – 453, 461) As Camarca did so, Officer Woodward said: "No, you're not free to leave yet." (R. 38-4 at 3:34:19 – 3:34:21; R. 38-7 at 3:34:19 – 3:34:21; R. 41, PageID 455; R. 45, PageID 727) Camarca yelled, "Yes, I am free to leave, you can suck a dick," while continuing to pull Sara toward the guest rooms. (R. 38-4 at 3:34:21 – 3:34:22; R. 38-7 at 3:34:21 – 3:34:22; R. 41, PageID 460; R. 45, PageID 727; R. 47, PageID 947 – 948) Simultaneously, Fuller said, "No, Tony!" and Officer Woodward told Camarca that now *he* was not free to leave either. (R. 38-4 at 3:34:21 – 3:34:22; R. 45, PageID 727, 762, 783 – 784, 789) Camarca ignored the command and continued to try and remove Sara from the lobby, telling Officer Woodward to "go fuck" himself. (R. 38-4 at 3:34:21 – 3:34:23; R. 41, PageID 486; R. 45, PageID 727 – 728, 762; R. 47, PageID 936, 945) Officer Woodward perceived Camarca's actions as "trying to take [Sara] away from me while I'm doing an investigation." (R. 45, PageID 725, 761 – 762, 765, 874) And, rightly so, because that was, in fact, Camarca's intention. Indeed, Camarca testified he knew Officer Woodward had told Sara to remain in the lobby for an investigation into the fight, and that,

Accordingly, since Officer Woodward reasonably determined that Camarca was a safety risk and because he was actively resisting or attempting to evade arrest, Officer Woodward did not use excessive force in pushing him toward the wall.

### B. OFFICERS WOODWARD AND CHRISTEN DID NOT USE EXCESSIVE FORCE WHEN TAKING CAMARCA TO THE GROUND TO PLACE HIM UNDER ARREST

After Officer Woodward attempted to place Camarca against a wall, Camarca subsequently turned and pushed off the wall with his right forearm, causing both himself and Officer Woodward to lose their balance and fall to the floor. (R. 38-1 at 0:07:50 – 0:07:52; R. 38-7 at 3:34:23 – 3:34:25; R. 45, PageID 729, 794, 807) Camarca contests this version of the facts.

But, even accepting Camarca's version of events that caused them to land on the ground – and no matter how the takedown event is parsed out – the video evidence clearly shows that Camarca was actively resisting the officers attempt to arrest him. Accordingly, instead of just being suspected of obstruction of an official investigation and public intoxication, Camarca was now resisting arrest. "Active resistance," of course, can be characterized by

---

when he attempted to remove Sara from the lobby, Camarca intended to defy Officer Woodward's order. (R. 41, PageID 452 – 453, 460)

physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. *King,* 97 F.4th at 393.

Here, Camarca can be seen in the body camera footage locking up his body to avoid being detained while simultaneously reaching toward Officer Christen's neck or upper chest area. (R. 38-7 at 3:34:35) On facts like these, law enforcement officers have wide latitude in employing the force necessary to gain control over such uncooperative, verbally hostile, and physically resistive individuals. *See e.g., Rudlaff,* 791 F.3d at 641 – 44 (finding use of a taser and knee strike to subdue an individual to be reasonable where individual was verbally defiant, swung his arms toward an officer, and locked up his body to avoid being handcuffed). Accordingly, based on the video evidence, the takedown and subsequent force used to effectuate Camarca's arrest were objectively reasonable.

Moreover, the fact that Camarca broke his leg does not change the fact that the officers' use of force to secure his arrest was reasonable. First, the "extent of the injury inflicted" is not a crucial factor when considering whether the force used was excessive. *Miller,* 606 F.3d at 252. Second, Camarca has not presented any evidence of the Officers' actions beyond those which are analyzed here that could have caused his injuries.

Therefore, the District Court correctly concluded that Officer Woodward did not use excessive force when taking Camarca to the ground and placing him under arrest.

### C. OFFICER WOODWARD DID NOT USE EXCESSIVE FORCE WHEN HE LOST HIS GRIP ON CAMARCA AS HE FELL

After placing Camarca in handcuffs and beginning to pick him up off the floor, Officer Woodward lost his grip causing Camarca to fall.

The court must view the facts in the light depicted by the videotape. *Scott v. Harris,* 550 U.S. 372, 381 (2007). The video evidence from Officer Christen's body camera footage clearly captured this segment of force. (R. 38-7 at 3:35:35-3:35:40) The footage shows Officer Woodward, who was standing to Camarca's left, grabbing Camarca under his left arm to assist him to his feet. Then, while attempting to stand, Camarca repeatedly shouted "you broke my leg" and began to stumble to his right – away from Officer Woodward's hold. With Camarca's weight taking him to the ground, the video footage unequivocally shows Officer Woodward losing his grip as Camarca fell.

Camarca contends that Officer Woodward shoved him headfirst into the wall. That contention is flatly refuted by the video evidence. There was no head first shove into a wall. Instead, Officer Woodward simply lost his grip on Camarca when he began to fall. Officer Woodward's interaction is akin to

*Vanpelt* where the court found that there was no excessive force where the officer released his grip as a handcuffed arrestee fell to the ground while exclaiming "[Y]ou broke my f—ing hip." *See VanPelt v. City of Detroit,* 70 F.4th 338, 341 (6th Cir. 2023).

### D. OFFICERS WOODWARD AND CHRISTEN DID NOT USE EXCESSIVE FORCE WHEN THEY ESCORTED CAMARCA FROM THE HOTEL

After lifting Camarca up off the ground, Officers Woodward and Christen escorted him out of the hotel. Camarca claims that the Officers used excessive force by forcing him to walk, or hop, on a broken leg out of the hotel. Again, the video evidence refutes Camarca's claim. The video evidence depicts Camarca hopping out of the lobby on his *non-injured leg,* with Officers Woodward and Christen on each side assisting him. (R.38-1 at 0:09:56 – 0:10:08)

Furthermore, it is a common sense prerequisite to an excessive force claim that some level of force was actually applied and that some physical injury resulted from that force. *See generally Rodriguez v. Passinault,* 637 F.3d 675, 687 (6th Cir. 2011) ("under Fourth Amendment's reasonableness standard, excessive force claims generally require at least *de minimis* physical injury."). When Officers Woodward and Christen escorted Camarca out of the hotel lobby, there was no application of force. Moreover, Camarca does not allege that being forced to hop on his *non-broken leg* exasperated his then-existing injuries.

Therefore, without evidence of an application of force by the officers, Camarca has failed to show that Officers Woodward and Christen are liable for excessive force for forcing him to hop on a non-injured leg.

### E. ALTERNATIVELY, THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

Assuming *arguendo* that Officers' Woodward and Christen force was unreasonable, the District Court nonetheless properly granted summary judgment to Officers Woodward and Christen because they are entitled to qualified immunity. Qualified immunity shields police officers from liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223 (2009). A qualified immunity inquiry involves two questions: (1) whether the defendant in question violated a constitutional (or federal statutory) right, and (2) whether that right was clearly established at the time of the defendant's conduct. *Id*. If either inquiry is resolved in the negative, i.e. if the defendant did not violate the plaintiff's constitutional right, or if the right in question was not clearly established, the defendant is entitled to qualified immunity. *Id*. The plaintiff bears the burden of showing the law was clearly established at the time of the alleged violation. *Bambach v. Moegle*, 92 F.4th 615 (6th Cir. 2024).

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The court cannot "define clearly established law at a high level of generality." *Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018). Indeed, the Supreme Court has directed the courts to employ a "high degree of specificity" in defining the relevant right so as to "better answer 'the crucial question whether the official acted reasonable in the particular circumstances that he or she faced.'" *Roberts v. Cruz,* 2023 U.S. App. LEXIS 4538, (6th Cir.) citing *District of Columbia v. Wesby,* 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018). Caselaw must "clearly and specifically hold what the officer did – under the circumstances the officer did it – violated the Constitution. *Rudlaff v. Gillispie,* 791 F.3d 638, 639 (6th Cir. 2015).

Against this standard, Camarca fails to identify the specific constitutional (or federal statutory) right that was allegedly violated when with regard to the force applied by Officers Woodward and Christen. Instead, Camarca broadly states that he "has already presented the sufficient evidence to show the Defendant Officers' multiple violations of his constitutional rights demanded by prong (1)." (Appellant Brief, p. 47) This assertion is legally insufficient. Broad assertions that the Defendants "employed excessive force upon Mr. Camarca…"

(Appellant Brief, p. 12), do not satisfy Camarca's burden to defeat qualified immunity.

Nonetheless, assuming *arguendo* that Camarca identified the right to be free from excessive force as his constitutional right that was allegedly violated, such an identification is still too broad and vague to displace the Officers' qualified immunity. Indeed, Camarca "cannot rely on the general right to be free from excessive force; instead, there must be some more specific right—one that was clearly established as of October 17, 2021—that the Defendants violated." (R. 60, Opinion & Order, PageID 1352) citing *Wysong v. City of Heath,* 260 F. App'x 848, 854 (6th Cir. 2008).

Camarca fails to cite to any case law that suggests that an individual has a right not to have an officer grab him from behind to prevent the individual from leaving the scene under the same or similar circumstances as the present case. Nor does Camarca provide case law establishing that an individual has a right not to have an officer push him toward a nearby wall when the individual pulls away from an officer under the same or similar circumstances as the present case. Finally, Camarca fails to cite to caselaw proving that an individual has an established right to not have an officer use manual force when the individual refuses to be handcuffed under the same or similar circumstances as the present case.

In fact, as of March 28, 2024, the Sixth Circuit has held that an officer is entitled to qualified immunity in connection with a takedown because "[t]here is no clearly established principle that prevents officers from taking individuals to the ground during an investigatory detention who have acted aggressively, failed to follow an officer's commands, and whose actions suggest they were trying to flee." *King,* 97 F.4th at 393.

Accordingly, Officers Woodward and Christen are entitled to qualified immunity on Camarca's Fourth Amendment excessive force claim.

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON CAMARCA'S CLAIMS FOR FAILURE TO INTERVENE CLAIM AGAINST OFFICERS MORRIS, MATHEWS, AND GILLILAND

While Camarca concedes that Officers Morris, Mathews, and Gilliland did not physically assault him, he appeals the District Court's holding that the Officers did not have a duty to intervene. His challenge is meritless.

Officers Morris, Mathews, and Gilliland did not have a duty to intervene because they could not have known that the force was unreasonable. An officer only has a duty to intervene if he *knows* another officer is engaged in unconstitutional conduct. *Kowolenek v. Moore,* 2012 U.S. App. LEXIS 3843 (6th Cir.). Similarly, officers cannot be found liable for failing to prevent unlawful conduct that did not occur. *Simmons v. Napier,* 626 Fed. Appx. 129.

Here, there was no constitutional violation because the force Officers Woodward and Christen used against Camarca was reasonable and constitutional.

Alternatively, even assuming *arguendo* that there was a constitutional violation, Officers Morris and Mathews had no reason to know that Officers Woodward and Christen were violating Camarca's rights.

Additionally, and of equal import, an officer has no duty to intervene to stop unconstitutional conduct of another officer unless there is a realistic opportunity for him to do so. *Kowolenek v. Moore,* 2012 U.S. App. LEXIS 3843 (6th Cir.). Generally, courts have "been unwilling to impose a duty to intervene where, as here, an entire incident unfolds in a matter of seconds" *Amerson v. Waterford Twp.,* 562 Fed. Appx. 484 citing *Ontha v. Rutherford County,* 222 Fed. Appx. 498.

By the time Officers Morris and Mathews entered the hotel lobby, Officers Woodward and Christen were already on the ground with Camarca, struggling to gain sufficient control of him to apply handcuffs. Officers Morris and Mathews were not, therefore, in a position to fully assess the reasonableness of the force because they did not know what crime Camarca was suspected of committing and they did not know whether or not Camarca had attempted to evade arrest. All they knew was what they could see at the moment they walked

into the lobby: Camarca on the ground refusing to submit to being handcuffed; Camarca actively trying to get up off the ground; three partygoers (Gessendorf, Sara, and Charles) attempting to pull Officers Woodward and Christen off of Camarca; Fuller hovering close enough to the fray to insert herself; and, Officers Woodward and Christen using nothing more than manual force to simultaneously try and overcome Camarca's vigorous resistance and fend off the partygoers. In short, Officers Morris and Mathews had no reason to know that a constitutional violation was occurring nor did they have an opportunity to intervene.

Finally, Officer Gilliland did not arrive on scene until *after* Camarca was sitting on the curb under the hotel's portico. (R. 38-7 at 3:36:57) Therefore, assuming *arguendo* the force used by Officers Woodward and Christen was unreasonable, Officer Gilliland had no way to know of the unreasonable force and no opportunity to stop it.

Finally, and alternatively, Officers Morris, Mathews and Gilliland were entitled to qualified immunity on Camarca's failure to intervene claim.

## IV. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO ON CAMARCA'S EQUAL PROTECTION AND DUE PROCESS CLAIMS

Generally, to prove an equal protection claim, the plaintiff must demonstrate that the government treated him disparately when compared to

similarly situated persons, and that such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis. *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011). Despite that precedent, Camarca argues that he was treated disparately from the other individuals who were present in the hotel lobby and acting similarly. (Appellant Brief, p. 45) Specifically, Camarca cites to the behavior of his family members and his wife, Sara. *Id.*

First, Camarca's argument that the initial 911 phone call pertained to Sara and did not involve Camarca is irrelevant. Second, while the other individuals who were present in the lobby and who were – according to Camarca – acting similarly to him but were not injured, those individuals were arrested for their conduct just as Camarca was. Any alleged difference in the treatment Camarca faced from the others is because he resisted arrest and the others did not.

Nonetheless, assuming *arguendo* that Camarca was disparately treated, that does not change the fact that he has failed to properly establish an equal protection claim. When a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis. *Club Italia Soccer & Sports Org.,*

*Inc. v. Charter Twp. Of Shelby,* 470 F.3d 286 citing *Radvansky,* 395 F.3d at 312. To establish that the defendant lacked a rational basis, plaintiff must negate every conceivable basis for a defendant's actions or show that the defendant was motivated by animus, which is impossible where the defendant's actions have a very clear rational basis. *Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby,* 470 F.3d 286. Under rational basis review, so long as the Court can conceive of a rational basis for the Defendant's conduct, it is the Plaintiff's – not the Defendant's – burden to show that there is no rational basis.

At bar, Camarca does not identify a fundamental right nor does he identify a class based on race, religion, national origin, alienage, or otherwise. Accordingly, it is Camarca's burden to prove that the officers' actions lacked any rational basis. However, the only attempt that he makes towards claiming that there was no rational basis is to assert: "clearly, there was no rational basis to treat Mr. Camarca any differently than his family and friends who were all similarly situated to him." (Appellant Brief, p. 46) In doing so, he misses the key point. He fails to negate *any* conceivable basis for the officers' actions nor does he identify any form of animus that could have motivated their actions.

For these reasons, the District Court appropriately granted summary judgment on Camarca's equal protection and due process claims.

## V. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON PLAINTIFF'S *MONELL* CLAIMS

In Counts I and III of his Complaint, Camarca asserted that the City is liable to him under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), for constitutional violations allegedly committed by the Individual Defendants. (R.1 Complaint, PageID 6 – 10) However, in order to place liability on the City under 42 U.S.C. § 1983, the plaintiff must show that his constitutional rights were violated in some way. *Grote v. Kenton County*, 85 F.4th 397 (6th Cir. 2023). As demonstrated above and as found by the District Court, Camarca's constitutional rights were not violated.

Alternatively, even if there was a constitutional violation, a 42 U.S.C. § 1983 liability cannot be premised on an *alleged* violation of departmental policy. Local governments are not liable under § 1983 for a constitutional violation unless the plaintiff demonstrates that the violation occurred because of an unconstitutional municipal policy or custom. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). To carry that burden, a plaintiff must identify the policy or custom on which his claim of municipal liability is based, connect the policy or custom to the municipality itself, and show that the particular injury was incurred because of the execution of the policy or custom. *Graham v. County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004).

The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton v. Harris,* 489 U.S. at 388, 109 S. Ct. 1197 (1989); *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006). However, it is not enough for a plaintiff to show that his injury could have been avoided if the officer has more or better training. *Amerson v. Waterford Twp.,* 562 Fed. Appx. 484 citing *Mayo v. Macomb Cnty.,* 183 F.3d 554, 558 (6th Cir. 1999). Instead, the plaintiff must show that the municipality's conscious policy regarding training and supervision amounts to deliberate indifference to constitutional rights. *Mayo v. Macomb Cnty.,* 183 F.3d 554, 558 (6th Cir. 1999) citing *City of Canton v. Harris,* 489 U.S. 378, 109 S. Ct. 1197 (1989).

Camarca theorizes that the individual officers were insufficiently trained and therefore, the City of Covington is liable under 42 U.S.C. § 1983. To support that theory, Camarca generally alleges that the officers did not have the requisite training on the use of force and specifically, that Officer Woodward did not have the required training. (R. 56 Response, PageID 1241) However, in an attempt to buttress his allegations with evidence, Camarca cites only to his "expert," Matthew Stiehm in which Stiehm averred that there were gaps in the officers' personnel policies manuals and that for at least two of the officers'

folders, there were deficiencies in certifications and testing. (Appellant Brief, p. 50) This is a classic *non sequitur:* The fact that Stiehm was not provided with information as to *whether* Officer Woodward was trained on manual force techniques does not establish that Officer Woodward was *not* trained on such techniques. Furthermore, the gaps in the Officers' personnel files is hardly evidence of the municipality having a conscious policy about training and supervision as required under *Mayo,* 183 F.3d 554. Indeed, all of the officers received training on the proper use of force.

Accordingly, the District Court properly granted summary judgment to Defendants on Camarca's 42 U.S.C. § 1983 claims against the City of Covington and the Officers in their official capacity.

## VI. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO DEFENDANTS ON PLAINTIFF'S STATE AND PUNITIVE DAMAGES CLAIMS

Camarca argues that the District Court erred when granting summary judgment on his state law claims and his claim for punitive damages. (Appellant Brief, p. 2) However, Camarca fails to make any argument as to why the District Court's ruling rejecting his punitive damages claim should be reversed. In addition, a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action. *Dalton v. Animas Corp.,* 913 F. Supp. 2d 370 citing *Toon v. City of Hopkinsville,* 2011 U.S. Dist. LEXIS

40830. Given his failure to address the issue in his Brief, the District Court's decision to grant summary judgment on Camarca's claim for punitive damages should be affirmed.

The District Court's decision granting summary judgment on Camarca's assault and battery claims must also be affirmed. A person with legal authority to act has a defense to an intentional tort claim. *Palmer v. Com.,* 252 S.W.2d 677 (Ky. 1952). A police officer is not liable for assault or battery in making an arrest, so long as he uses no more force than is reasonably necessary in accomplishing a lawful arrest. *City of Lexington v. Gray,* 499 S.W.2d 72 (Ky. 1973). Here, Officers Woodward and Christen are not liable for assault or battery because, as demonstrated, the arrest was lawful, and they used no more force than was reasonably necessary in effectuating the arrest.

As to the tort of outrage, a claim for the tort of outrage must be dismissed when the facts alleged, if proven to be true, give rise to one or more traditional torts. *Rigazio v. Archidiocese of Louisville,* 853 S.W.2d 295 (Ky. App. 1993). Here, the facts as alleged by Camarca, if true, would give rise to traditional tort claims such as unlawful arrest and assault and, therefore, Camarca's outrage claim is subsumed by his other tort claims. Moreover, Camarca fails to make a meaningful argument in opposition and instead, merely contends that he the

Court has jurisdiction over the state-law claims under 28 U.S.C. § 1387. (Appellant Brief, p. 51)

## VII.  CONCLUSION

For all of these reasons, Appellees respectfully request that this Court affirm the decision of the District Court in all respects.

Respectfully submitted,

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq. (#43548)
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY 41011
p: 859.394.6200 | f: 859.392.7200
jmando@adamsattorneys.com

*Attorney for Defendants-Appellees, the City of Covington Police Department; Officer Woodward; Officer Christen; Officer Morris; Officer Mathews; and, Officer Gilliland*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation provided in Fed.R.App.P.32(a)(7)(B). The foregoing brief contains 11,591 words of 14 point proportional type.

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq.

## CERTIFICATE OF SERVICE

This is to certify that on the **6th** day of October, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:  Donald L. Nageleisen, Esq.

*/s/ Jeffrey C. Mando*
Jeffrey C. Mando, Esq.

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Appellees, City of Covington, KY Police Department; Officer Ross Woodward; Officer Robert Christen; Officer Bradley Morris; Officer Samual Mathews; and, Sergeant Michael Gilliland, pursuant to Sixth Circuit Rule 28(d), hereby designate the following filings in the district court's record as items to be included in the joint appendix:

| Description of Document | Date Filed | Record No. |
|---|---|---|
| Complaint | 10.14.22 | 1 |
| Defendants' Motion for Summary Judgment | 10.15.24 | 38 |
| Marriott Video 1 | 10.15.24 | 38-1 |
| Call for Service Report | 10.15.24 | 38-2 |
| 911 Audio | 10.15.24 | 38-3 |
| Body Worn Camera Video – Officer Russ Woodoward | 10.15.24 | 38-4 |
| Body Worn Camera Video – Officer Bradley Morris | 10.15.24 | 38-5 |
| Marriott Video 2 | 10.15.24 | 38-6 |
| Body Worn Camera Video – Officer Ryan Christen | 10.15.24 | 38-7 |
| Uniform Citation | 10.15.24 | 38-8 |
| Notice of Conventional Filing | 10.15.24 | 40 |
| Deposition Transcript – Anthony Camarca PageID 434, 435 – 442,443, 444, 445, 449, | 10.15.24 | 41 |

A

| Description of Document | Date Filed | Record No. |
|---|---|---|
| 452 – 455, 457, 460,461, 467 – 470, 475, 481 – 482, 486 | | |
| Deposition Transcript – Charles Cummins PageID 507 – 511, 513 – 516, 518, 522, 525 – 526 | 10.15.24 | 42 |
| Deposition Transcript – Layce Cummins PageID 549 – 550, 552, 553 – 557 | 10.15.24 | 43 |
| Deposition Transcript – Russ Woodward PageID 715, 719, 721 – 724, 725, 726 – 729, 730, 734, 738 – 740, 743 – 747, 761 – 762, 765, 771, 783 – 784, 789, 794, 799, 807, 874 | 10.15.24 | 45 |
| Deposition Transcript – Robert Christen PageID 839, 841, 844 – 845, 851, 855 – 858, 869, 875, 879 – 880 | 10.15.24 | 46 |
| Deposition Transcript – Sara Camarca PageID 913 – 914, 915, 916, 917, 919 – 925, 927 – 930 – 931, 933 – 936, 939 – 940, 943 – 945, 947 – 948, 950 | 10.15.24 | 47 |
| Plaintiff's Response in Opposition to Motion for Summary Judgment PageID 1241 | 12.16.24 | 56 |
| Opinion and Order PageID 1338 – 1356 | 04.16.26 | 60 |
| Judgment PageID 1357 | 04.16.25 | 61 |